# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANJIE HUGHES,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | **NO. 22-3712** |
| **v.** | : | |
| | : | |
| **MUHLENBERG TOWNSHIP** | : | |
| **POLICE OFFICER MALACHI** | : | |
| **SCHMIDT,** *et al.,* | : | |
| *Defendants.* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                    FEBRUARY 23, 2026

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff Anjie Hughes, ("Plaintiff"), individually and as the Administratrix for the Estate

of her father Stephen Hughes, ("Hughes"), filed this wrongful death and survival action pursuant

to 42 U.S.C. § 1983, ("Section 1983"), and 42 Pa. Cons. Stat. § 8301-8302, against Defendants

Muhlenberg Township Police Officers Malachi Schmidt, ("Officer Schmidt"), and Michael Travis,

("Officer Travis"), (collectively, "Defendants").[1]  In her complaint, Plaintiff avers that Defendants

entered Hughes' home without consent, warrant, exigent circumstances, or other legal justification,

and that, once inside the residence, Defendants broke into Hughes' bedroom and tased and fatally

shot him.

---

[1]      Section 1983 provides that an individual may bring a civil action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, while Sections 8301 and 8302 to Title 42 of the Pennsylvania Consolidated Statutes provide that all causes of action survive an individual's death and for a cause of action for the recovery of damages when death is caused by a wrongful act or negligence. *See Williams v. Rutala*, No. CV 24-2132, 2025 WL 3008816, at *4 (E.D. Pa. Oct. 24, 2025) (first citing *Cappel v. Aston Twp. Fire Dep't*, 693 F. Supp. 3d 467, 496 (E.D. Pa. 2023); and then citing *Donahue v. Borough of Collingdale*, 714 F. Supp. 3d 504, 508 n.7 (E.D. Pa. 2024)) (finding that Sections 8301 and 8302 are "vehicles through which" Section 1983 claims may be brought).

1

Plaintiff asserts the following claims against Defendants: a Pennsylvania state-law battery claim, (Count I); a Section 1983 claim for unreasonable search in violation of the Fourth Amendment, (Count II); and a Section 1983 claim for excessive force in violation of the Fourth Amendment, (Count III).[2] Discovery ensued and was completed.

Presently, before the Court are Defendants' motion for summary judgment, (*see* ECF 29), filed pursuant to Federal Rule of Civil Procedure, ("Rule"), 56, and Plaintiff's cross-motion for partial summary judgment with respect to Count II of the complaint, (*see* ECF 30). In their motion, Defendants argue that they are entitled to summary judgment on all claims based on their defense of qualified immunity and Pennsylvania state law immunity. Plaintiff contests Defendants' entitlement to any immunity and, as to Count II, argues that she is entitled to judgment as a matter of law due to the lack of a genuine factual dispute pertinent to her unlawful entry claim. The issues in the motions have been fully briefed and are ripe for disposition.[3] For the reasons set forth herein, Plaintiff's motion is denied, Defendants' motion is granted, and this matter is dismissed.

**BACKGROUND**

When ruling on a motion for summary judgment, a court must consider the evidence in the light most favorable to the non-movant; in this case, Plaintiff. *See Qin v. Vertex, Inc.*, 100 F.4th 458, 469 (3d Cir. 2024). With respect to Plaintiff's partial motion for summary judgement, the

---

[2]    While Plaintiff's excessive force claim is labeled as "Count II" in her complaint, (*see* ECF 1), it is referred to by the parties as "Count III" in summary judgment briefing. Thus, the Court refers to Plaintiff's excessive force claim as Count III.

[3]    The Court has also considered each parties' respective opposition briefs, (*see* ECF 33, 34).

2

court must consider the evidence in the light most favorable to the non-movant, the Defendants.

The facts relevant to Plaintiff's claims and Defendants' motion are as follows:[4]

At the time of the events, Hughes resided at 706 Wagon Wheel Lane, Muhlenberg Township, Pennsylvania, (hereinafter, the "Residence"), with his elderly mother, Geraldine Hughes, ("Ms. Hughes").[5]   He was 62 years old.[6] Plaintiff is Hughes' daughter and Ms. Hughes' granddaughter.  Plaintiff had not been present during the tragic events of March 14-15, 2021.

On March 14, 2021, at Ms. Hughes' request, Kristy Killian, ("Killian"), visited with Hughes at the Residence to discuss Hughes' need for medical mental health assistance.[7]  Killian is Ms. Hughes' granddaughter and Hughes' niece.  Ms. Hughes had reached out to Killian because Killian shared a close bond with Hughes.[8]

On that day, Killian spoke with Hughes for approximately an hour.[9]  Killian heard him say he was "ready for God," which Killian understood to mean that he was ready to die.  During their conversation, Hughes held a knife near Killian's face and said, "I could kill you right now if I wanted to."[10]  Ms. Hughes felt that Killian failed to make any headway convincing Hughes that he needed help.[11] Seeking advice and additional guidance, Killian contacted Mr. Albert, a certified recovery specialist and intervention professional, to discuss alternative treatment.[12]

---

[4]       These facts are gleaned from the parties' briefs, exhibits, and statements of facts.  To the extent that any fact is disputed, such dispute will be noted and, if material and supported by record evidence, may be construed in Plaintiff's favor.

[5]       (Defendants' Statement of Undisputed Material Facts, ("SOUMF"), ECF 31 at p. 1 ¶ 2) (citing Plaintiff's Complaint, ECF 1 at ¶ 10).

[6]       (SOUMF, ECF 31 at p. 6 ¶¶ 45, 54).

[7]       (Dep. of Killian, ECF 31-2 at p. 14).

[8]       (Dep. of Ms. Hughes, ECF 31-7 at p. 33, 35).

[9]       (*Id.* at p. 35).

[10]       (Plaintiff's Opposition Brief, ("Pltf's Brief"), ECF 34 at p. 4); (SOUMF, ECF 31 at p. 6 ¶ 51) (citing Dep. of Killian, ECF 31-2 at p. 16);  (ECF 31 at p. 8 ¶ 72) (citing Dep. of Officer Schmidt, ECF 31-3 at pp. 34-35, 41).

[11]       (Dep. of Ms. Hughes, ECF 31-7 at p. 35, 54-55).

[12]       (SOUMF, ECF 31 at p. 11 ¶¶ 109-10) (citing Dep. of Albert, ECF 31-5 at pp. 10-11); (Dep. of Killian, ECF 31-2 at p. 101).

Although Ms. Hughes denies being then aware that Hughes had threatened Killian with a knife, the parties appear to agree that Ms. Hughes told Plaintiff about the incident the evening of March 14, 2021, and that Plaintiff considered Hughes' behavior to be threatening.[13] Ms. Hughes told Plaintiff that Killian had the situation under control and was going to call Mr. Albert.[14] That same evening, Ms. Hughes, frightened because Hughes was yelling and screaming, hid inside a closet and again called Killian for help addressing Hughes' behavior.[15] Ms. Hughes insisted they reconvene in the morning.[16]

The following day, on March 15, 2021, Plaintiff called her grandmother to ask if "everything was okay because her 'dad had been like kind of all over the place.'"[17] Ms. Hughes told Plaintiff that Killian was going to handle matters with Hughes, so Plaintiff did not go to the Residence that day.[18]

Separately, Mr. Albert called Ms. Hughes and believed her to be upset, concerned, and in fear.[19] Ms. Hughes told Mr. Albert that Hughes had hit her, was bipolar, not taking his medication, had cancer, and was drinking that day.[20] The call was disconnected and, when Mr. Albert called back, Hughes answered the phone, called Mr. Albert a profanity, and hung up.[21] Ms. Hughes called Killian to let her know that the call with Mr. Albert did not go well and asked her to come and try and talk to Hughes again, telling her to "do what you have to do."[22] Concerned for Ms. Hughes' safety, Mr. Albert called Killian to encourage her to get to Ms. Hughes right away and to call 911 *en* route.[23]

---

[13]    (*Id.* at p. 5 ¶¶ 36-37) (citing Dep. of Plaintiff, ECF 31-1 at pp. 39-41); (Dep. of Plaintiff, ECF 31-1 at p. 39-42).

[14]    (Dep. of Plaintiff, ECF 31-1 at p. 42-43).

[15]    (SOUMF, ECF 31 at p. 13 ¶¶ 127, 131) (citing Dep. of Ms. Hughes, ECF 31-7 at pp. 30-32, 72-73); (Dep. of Killian, ECF 31-2 at pp. 21-22).

[16]    (Dep. of Killian, ECF 31-2 at pp. 21-22).

[17]    (SOUMF, ECF 31 at pp. 4-5 ¶¶ 35, 38) (citing Dep. of Plaintiff, ECF 31-1 at pp. 35-36).

[18]    (*Id.*) (citing Dep. of Plaintiff, ECF 31-1 at p. 48).

[19]    (*Id.* at p. 12 ¶ 111) (citing Dep. of Albert, ECF 31-5 at p. 16).

[20]    (*Id.* at ¶ 113) (citing Dep. of Albert, ECF 31-5 at p. 18).

[21]    (*Id.* at ¶ 114) (citing Dep. of Albert, ECF 31-5 at pp. 19, 23).

[22]    (Dep. of Ms. Hughes, ECF 31-7 at pp. 45, 73-74, 96, 98); (SOUMF, ECF 31 at p. 13 ¶ 131).

[23]    (*Id.* at p. 5 ¶¶ 40-41, ¶ 115) (first citing Dep. of Albert, ECF 31-5 at p. 19; and then citing Dep. of Killian, ECF 31-2 at pp. 23-24).

4

Killian, believing she had the authority to remove Hughes from the house, went to the Residence.[24] In the interim, Ms. Hughes left the Residence — as she felt that leaving was necessary.[25] Upon arriving, Killian saw Hughes in the kitchen making coffee and told him that she was calling for help and that he needed to pack his bags.[26] At approximately 2:15 p.m., she stepped outside to call the Muhlenberg Township non-emergency line to request that police officers be dispatched to the Residence.[27] The call was rolled to 911.[28]

Killian told the 911 operator that Hughes was "being very threatening" and requested an officer as soon as possible.[29] She also advised that she needed assistance getting Hughes to the hospital.[30] The dispatcher notified Officer Schmidt of the call and described the substance of the call; Officer Schmidt decided to respond to the Residence.[31] After hanging up, Killian went back into the Residence to tell Hughes that the police were on their way.[32] In response, Hughes stood at the top of the Residence's stairwell with a knife and said, "I will be ready for them."[33]

Hughes' threatening response prompted Killian to call 911 a second time to again request officer presence and advise that Hughes was aware officers were coming and that he had a knife with a six-to-eight inch blade, would fight, and was unlikely to cooperate.[34] Killian told the dispatcher: "[the officers] have to come."[35] Killian also told the dispatcher that Hughes had threatened her with a knife the day

---

[24] (SOUMF, ECF 31 at pp. 5, 7 ¶¶ 42, 56) (citing Dep. of Killian, ECF 31-2 at pp. 11, 112).

[25] (Dep. of Ms. Hughes, ECF 31-7 at pp. 73-74); (ECF 31 at p. 13 ¶ 131).

[26] (SOUMF, ECF 31 at p. 5 ¶ 42) (citing Dep. of Killian, ECF 31-2 at p. 11).

[27] (Pltf's Brief, ECF 34 at p. 3).

[28] (SOUMF, ECF 31 at pp. 5-6 ¶ 44) (first citing Dep. of Killian, ECF 31-2 at pp. 11, 28-32; then citing Incident Report Form, ECF 31-2 at pp. 164-68).

[29] (Incident Report Form, ECF 31-2 at p. 164).

[30] (*Id.*).

[31] (Dep. of Officer Schmidt, ECF 31-3 at pp. 24-27).

[32] (SOUMF, ECF 31 at p. 6 ¶ 46) (citing Dep. of Killian, ECF 31-2 at p. 13).

[33] (*Id.* at p. 6 ¶ 47) (citing Dep. of Killian, ECF 31-2 at p. 13).

[34] (Incident Report Form, ECF 31-2 at pp. 164-65).

[35] (*Id.*).

before.[36]  She also gave the dispatcher Hughes' physical attributes and advised that he lived with his mother-her grandmother, was an alcoholic, had brain cancer, and was "not normal."[37]  Killian confirmed to the dispatcher that, at that time:  Hughes was upstairs in his bedroom; she was outside; Ms. Hughes had left the Residence; and no one else was inside the Residence.[38]  Killian also requested that the officers refrain from using lights and sirens on arrival.[39]  Killian ended the call by telling the dispatcher that she would "call back if I need you or if [the officers] don't get here in time."[40]

While *en* route to the Residence, Officer Schmidt spoke with dispatch on a recorded line.[41]  The following is a transcription of the conversation:

> **Dispatch to [Officer Schmidt]**, 706 Wagon Wheel Lane a female caller stated her uncle is on location threatening. She gave the address phone number and stated she had to go, disconnected.

> **Dispatch to [Officer Schmidt]**, additional, received phone call back stating acting male is 62, [Hughes], he does have a 6" knife, he threatened the complainant yesterday, white male approximately 110 [pounds], with stage four cancer, currently upstairs in a bedroom, acting male is aware complainant called and s[t]ated he will be at the top of the stairs waiting for you with the knife.

> **Dispatch to [Officer Schmidt]**, requesting no lights and sirens, [Hughes] will not cooperate when he is sitting at the top of the steps for you with the knife, almost sounds more like a threat than if he is going to drop i[t].

> **[Officer Schmidt] to Dispatch**, is he actually threatening the complainant or just making threats.

> **Dispatch to [Officer Schmidt]**, sounds like she is being threatened with the knife, but we can't be sure because we were disconnected again.

---

[36]    (*Id.*).

[37]    (*Id.* at p. 164).

[38]    (*Id.* at p. 165).

[39]    (*Id.*).

[40]    (*Id.*).

[41]    (Pltf's Brief, ECF 34 at p. 3).

Upon arriving at the Residence, Officer Schmidt spoke with Killian outside the Residence.[42]  Killian reiterated what had transpired and that Ms. Hughes had contacted her "concerning some fear about [Hughes'] behavior," and that Hughes had threatened Killian with a knife the day prior.[43]  Killian told Officer Schmidt that she needed to get Hughes help, but he was not going to go willingly.[44]  Killian also told Officer Schmidt that she had previously hid the knives at the Residence; that Hughes suffered from stage four cancer, bipolar disorder, and alcoholism; had recently stopped taking his medication; had expressed being tired with living; had a knife on his person; and was waiting for the officers threateningly.[45]

As Killian expressed that Hughes needed medical help, she agreed when Officer Schmidt asked if she would be willing to involuntarily commit Hughes for treatment. [46]  Based on what Killian told him, Officer Schmidt believed Killian's grandmother, Ms. Hughes, lived at the Residence, but knew she was not present at that time.[47]  Officer Schmidt was aware that, although Killian was sent to the Residence by Ms. Hughes, Killian did not own the Residence nor reside there.[48]  Officer Schmidt considered the incident a "domestic with mental health issue involved."[49]

In the meantime, additional officers arrived at the Residence, including Officer Travis.[50]  Officer Travis responded to the Residence after hearing the dispatcher's conversation with Officer Schmidt.[51]  Officer Travis overheard the following details between Officer Schmidt and Killian; *to wit*:  Hughes had a knife

---

[42]    (*Id.* at pp. 3-4); (Dep. of Officer Schmidt, ECF 31-3 at p. 34).

[43]    (Dep. of Officer Schmidt, ECF 31-3 at p. 34); (ECF 31 at p. 8 ¶ 72) (citing Dep. of Schmidt, ECF 31-1 at pp. 34-35, 41).

[44]    (Dep. of Killian, ECF 31-2 at p. 37).

[45]    (SOUMF, ECF 31 at p. 8 ¶¶ 72, 75) (citing Dep. of Schmidt, ECF 31-3 at pp. 34-35, 37-38, 41).

[46]    (*Id.* at pp. 6, 8, ¶¶ 55, 73-74) (first citing Dep. of Killian, ECF 31-2 at p.37; then citing Dep. of Officer Schmidt, ECF 31-3 at p. 35); (Dep. of Officer Schmidt, ECF 31-1 at p. 35).

[47]    (Dep. of Officer Schmidt, ECF 31-3 at p. 34).

[48]    (*Id.* at p. 34-35, 37; *see also* Pltf's Brief, ECF 34 at pp. 3-4, 20).

[49]    (SOUMF, ECF 31, p. 6, 8, ¶¶ 55, 73-74) (first citing Dep. of Killian, ECF 31-2 at p.37; then citing Dep. of Officer Schmidt, ECF 31-3 at p. 35).

[50]    (Pltf's Brief, ECF 34 at p. 3) (citing Dep. of Officer Schmidt, ECF 34-1 at 45:24-46:1); (*see also* ECF 31 at p. 10 ¶ 94).

[51]    (Dep. of Officer Travis, ECF 31-4 at pp. 18:10-19:10, p. 19:24-20:9, 20:24-21:1).

and was waiting inside the house; Hughes was intoxicated and had mental health issues; Hughes had, the day prior, held a knife to Killian's face and threatened her; and Officer Schmidt and Killian were discussing the possibility of a mental health commitment.[52]

Officer Schmidt informed Officer Travis of the conversation he had with Killian, and both agreed they needed to enter the Residence.[53] They did not plan to arrest Hughes and, because Hughes was armed with a knife and acting irrationally, elected to proceed without a warrant.[54] According to Officer Travis, the purpose of entering the Residence was to strike up a conversation with Hughes, determine if he was still armed and, if so, make the scene safe and then secure medical treatment for Hughes.[55]

Killian entered the Residence with both officers through the front door.[56] She allowed them to enter because she "needed their help."[57] Killian told them where Hughes' bedroom was located.[58] Upon entering the Residence, Killian called up to Hughes to let him know they were all there; she heard Hughes say "f—ck you, a—hole."[59] Officer Schmidt drew his firearm and Officer Travis drew his taser.[60] Prior to attempting to communicate with Hughes, Defendants walked through the first floor.[61] They proceeded to the second floor, where Hughes had locked himself in his bedroom, and Officer Schmidt introduced himself as they walked up the steps.[62] Officer Schmidt knocked on Hughes' door and, attempting

---

[52]    (SOUMF, ECF 31 at p. 10 ¶¶ 94-97) (citing Dep. of Officer Travis, ECF 31-4 at pp. 21-23, 25).

[53]    (Pltf's Brief, ECF 34 at pp. 3-4) (citing Dep. of Officer Schmidt ECF 34-1 at p. 46); (Dep. of Officer Schmidt, ECF 31-3 at p. 47) ("He had made a vague threat about waiting for anyone that came to help").

[54]    (SOUMF, ECF 31 at p. 10 ¶ 100) (citing Dep. of Officer Travis, ECF 31-4 at p. 26); (Dep. of Officer Schmidt, ECF 31-3 at p. 42).

[55]    (*Id.* at p. 10 ¶ 99) (citing Dep. of Officer Travis, ECF 31-4 at p. 27).

[56]    (*Id.* at p. 7 ¶¶ 57-58) (citing Dep. of Killian, ECF 31-2 at pp. 38-40); (Dep. of Officer Schmidt, ECF 31-3 at pp. 48-49).

[57]    (Dep. of Killian, ECF 31-2 at pp. 39-40).

[58]    (SOUMF, ECF 31 at p. 7 ¶¶ 57-58) (citing Dep. of Killian, ECF 31-2 at pp. 38-40); (Dep. of Officer Schmidt, ECF 31-3 at pp. 48-49).

[59]    (Dep. of Killian, ECF 31-2 at p. 93).

[60]    (Dep. of Officer Travis, ECF 31-4 at p. 28; *see also* ECF 31 at p. 2 ¶ 11; ECF 34 at p. 4).

[61]    (Pltf's Brief, ECF 34 at p. 4) (citing ECF 3[1] at p. 2 ¶¶ 12, 13).

[62]    (*Id.* at p. 4) (citing ECF 3[1] at p. 2 ¶¶ 12, 13).

to engage Hughes in conversation, stated that he just wanted to help.[63]  In response, Hughes was verbally aggressive, and told Defendants that he did not want to talk and did not want their help.[64]

Despite Hughes' protestations, Defendants persisted in their attempts to engage with him, repeatedly telling him they wanted to help.[65]  When Officer Schmidt continued to try to build rapport with Hughes, Hughes responded by talking about the Eiffel Tower.[66]  He answered affirmatively when Officer Schmidt asked whether he was holding a knife, stating he had it to protect himself.[67]  After a few minutes, Hughes told Officer Schmidt that he was done talking to him and went silent for several minutes.[68]  At no point during the interaction did Hughes tell the officers to leave the house.[69]

Concerned that Hughes may have harmed himself, or would do so, Defendants felt that time was of the essence.[70]  In addition to being a threat to himself, Defendants were concerned that Hughes, left to his own devices, would come out and menace someone else.[71]  Defendants decided to open the bedroom door using a key found by one of the officers at the scene.[72]

Once the door was unlocked, the officers remained in the hallway outside of Hughes' bedroom which, due to the bedroom's size, put them in close quarters

---

[63]    (SOUMF, ECF 31 at pp. 3, 9 at ¶¶ 13-15, 77) (citing ECF 1 at ¶¶ 25-26; then citing Dep. of Officer Schmit, ECF 31-3 at p. 55); (Dep. of Killian, ECF 31-2 at p. 91) ("The officer started up the steps introducing himself.  I could hear [Hughes] say f—ck you, a—hole.").

[64]    (*Id.* at p. 4) (first citing Dep. of Officer Schmidt, ECF 34-1 at p. 56:1-56:24; then citing ECF 3[1] at p. 3 ¶ 15); (SOUMF, ECF 31 at p. 9 ¶¶ 78-80) (citing Dep. of Officer Schmidt, ECF 31-3 at pp. 56, 58).

[65]    (Pltf's Brief, ECF 34 at pp. 4-5) (citing ECF 3[1] at p. 16 ¶¶ 16, 17).

[66]    (SOUMF, ECF 31 at p. 9 ¶ 83) (citing Dep. of Officer Schmidt, ECF 31-3 at p. 61).

[67]    (*Id.* at p. 3 ¶¶ 19-20).

[68]    (Pltf's Brief, ECF 34 at p. 5) (citing ECF 3[1] at ¶ 20); (SOUMF, ECF 31 at p. 9 ¶ 85) (citing Dep. of Officer Schmidt, ECF 34-3 at pp. 62-63).

[69]    (Dep. of Officer Schmidt ECF 31-3 at pp. 55:23-25).

[70]    (SOUMF, ECF 31 at p. 9 and 11 ¶¶ 86-87, 102) (first citing Dep. of Officer Schmidt, ECF 34-3 at pp. 64, 66; then citing Dep. of Officer Schmidt, ECF 34-4 at p. 32); (Dep. of Officer Schmidt, ECF 34-3 at pp. 67:13-63:16).

[71]    (*Id.*).

[72]    (*Id.* at p. 9 ¶¶ 86-87) (citing Dep. of Officer Schmidt, ECF 34-3 at pp. 64, 66); (*See also* Dep. of Officer Schmidt, ECF 34-3 at pp. 67:13-63:16); (*See also* Dep. of Officer Travis, ECF 31-4 at p. 37).

of approximately six feet or less.[73]  Hughes immediately turned towards Officer Schmidt with a knife in his right hand.[74]  Officer Schmidt told Hughes, repeatedly, to drop the knife; Hughes responded by yelling, "f—ck you" and advancing towards Officer Schmidt.[75]  When Hughes came within approximately four feet of the officers, Officer Travis tased Hughes, causing him to momentarily dip his shoulder but did not drop the knife from his right hand.[76]

Despite being tased, Hughes continued to advance towards Officer Schmidt, ignoring his commands to drop the knife.[77]  From the first floor of the Residence, another officer on scene heard Officer Schmidt yell: "drop the knife, drop the knife, drop the knife."[78]  As Hughes continued to advance, Officer Schmidt discharged his firearm, shooting Hughes in the chest.[79]  Officers at the scene and ambulance personnel administered life-saving care.[80]  Hughes was transported to a hospital, where he was pronounced deceased.[81]

Hughes' post-mortem toxicology report revealed that, at the time of being shot, Hughes had a blood alcohol concentration of 0.268%—more than three times the legal limit to operate a motor vehicle in Pennsylvania.[82]  On April 15, 2021, the Berks County District Attorney, (the "DA"), published the results of its investigation into Hughes' death, finding that Officer Schmidt discharged his firearm lawfully in defense of himself and in the defense of another.[83]  As such, no

---

[73]     (Dep. of Officer Schmidt, ECF 31-3 at pp. 54-55); (Dep. of Officer Travis, ECF 31-4 at pp. 46-50); (Photograph, ECF 31-10).

[74]     (SOUMF, ECF 31 at p. 9 ¶ 88) (citing Dep. of Officer Schmidt, ECF 34-3 at p. 71).

[75]     (*Id.* at pp. 9-10 ¶¶ 89-90) (citing Dep. of Officer Schmidt, ECF 34-3 at pp. 71-72); (*See also id.* at p. 11 at ¶ 104) (citing Dep. of Officer Travis, ECF 34-3 at p. 51).
[76]     (SOUMF, ECF 31 at p. 10 ¶ 91) (citing Dep. of Officer Schmidt, ECF 34-3 at pp. 75-76); (*See also id.* at p. 11 at ¶¶ 105-06) (citing Dep. of Officer Travis, ECF 34-3 at pp. 51-52); (*See also* DA Report, ECF 31-11 at p.2).

[77]     (Pltf's Brief, ECF 32 at p. 11 at ¶ 107) (citing Dep. of Officer Travis, ECF 34-3 at p. 52); (*See also* Dep. of Officer Travis, ECF 31-3 at pp. 71:76:20-77:1).

[78]     (SOUMF, ECF 31 at p. 13 ¶ 124) (citing Dep. of Officer Schearer, ECF 31-5 at p. 59).

[79]     (*Id.*).

[80]     (DA Report, ECF 31-11 at p. 2).

[81]     (*Id.*).

[82]     (*Id.* at p. 3).

[83]     (*Id.* at p. 1).

10

criminal charges were filed against Defendants.[84]  The DA made the following additional conclusions:[85]

> [Officer Schmidt] was reasonable in his belief that he and [Officer Travis] were in imminent danger of death or serious bodily injury due to Hughes' actions of refusing to comply with all police commands and by advancing towards the officers with a knife.  It is also reasonable to believe that Hughes had the intent and means to inflict death or serious bodily injury to the officers and the officer's use of deadly force under these circumstances was reasonable and therefore privileged under Pennsylvania law.
>
> While it is unfortunate that a life was lost, the action taken by the officer involved was for protecting himself and his fellow officer.

Plaintiff, who had not seen Hughes for approximately thirty-six hours before his death, brings this lawsuit.[86]

## LEGAL STANDARDS

Rule 56 governs summary judgment motion practice.  *See* Fed. R. Civ. P. 56.  Specifically, this Rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 56(a).  A fact is "material" if proof of its existence or non-existence "might affect the outcome of the suit under governing law[,]" and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When evaluating a motion pursuant to Rule 56, the court must view the evidence in the light most favorable to the nonmoving party.  *See Qin*, 100 F.4th at 469 ("[S]ummary judgment is appropriate only if, construed in the light most favorable to the non-

---

[84]    (*Id.*).

[85]    (*Id.* at p. 3).

[86]    (SOUMF, ECF 31 at p. 4 ¶ 29) (citing Dep. of Plaintiff, ECF 31-1 at p. 69).

moving party, the record shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law.") (internal citations omitted).

Consistent with Rule 56, the movant "bears the initial [burden] of informing the . . . court of the basis for its motion and identifying those portions" of the record that the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case[.]" *Id.* at 322. After the movant has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the movant's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)-(B).

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions[,]" *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or rest on the allegations in the pleadings, *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings" and, either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

12

**DISCUSSION**

Section 1983 provides an avenue for private citizens to seek civil remedies when they have been deprived of their rights by a state official in violation of the Constitution or federal law. *See* 42 U.S.C. § 1983. To establish a Section 1983 claim, a plaintiff must show "a violation of a right secured by the Constitution and/or laws of the United States and that the alleged deprivation was committed by a person acting under color of state law." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Pursuant to Section 1983, Plaintiff brings a Fourth Amendment claim against Defendants for (a) unlawful entry into Hughes' home without legal justification, and (b) excessive force, based on their discharge of a taser and a firearm during their encounter with Hughes. As noted, in their motion for summary judgment, Defendants offer the defense of qualified immunity.

Government officials, including police officers, are shielded from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Qualified immunity protects from suit "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (citation and internal quotation marks omitted).

"In determining whether an officer is entitled to qualified immunity, the district court engages in a two-prong inquiry: (1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (internal quotation marks and modifications omitted) (quoting *Saucier v.*

13

*Katz*, 533 U.S. 194, 201-02 (2001)). "An answer in the negative to either prong entitles an officer to qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (citing *Reedy v. Evanson*, 615 F.3d 197, 223-24 (3d Cir. 2010)); *see also Saucier*, 533 U.S. at 201.

While "[c]ourts may begin their inquiry with either prong[,]" *id.*, the United States Court of Appeals for the Third Circuit, ("Third Circuit"), has held that the first prong should ordinarily be addressed first, *see Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). "Should the court choose to address the alleged constitutional violations, . . . analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity." *Crouse v. South Lebanon Twp.*, 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (citing *Gruenke v. Seip*, 225 F.3d 290, 299-300 (3d Cir. 2000)).

"At summary judgment, the burden is on the officer to establish an entitlement to qualified immunity." *Peroza-Benitez*, 994 F.3d at 165 (citing *Halsey*, 750 F.3d at 288). While courts performing a qualified immunity analysis ordinarily analyze "the specific conduct of each defendant separately," the court may consider the officers' actions together when the individuals "acted in concert." *Cole v. Encapera*, 758 F. App'x 252, 255 (3d Cir. 2018) (citing *Grant v. City of Pittsburgh*, 98 F.3d 116, 118 (3d Cir. 1996)); *see also Minor v. Del. River and Bay Auth.*, 70 F.4th 168, 177 n.5 (3d Cir. 2023) (noting the relaxed standard for collective conduct).

Here, in their motion for summary judgment, Defendants argue that their conduct did not violate the Fourth Amendment because their entry was justified pursuant to recognized exceptions to the warrant requirement, and that the force they used was reasonable. Defendants further argue that, if the Court reaches the second prong of the qualified immunity analysis, it should conclude that a reasonable officer standing in their shoes would have believed their actions to be constitutionally compliant.

14

In response, Plaintiff argues that genuine issues of material fact exist with respect to Defendants' justifications for their warrantless entry and the reasonableness of the force used. Plaintiff also argues that Defendants are not entitled to qualified immunity on the excessive force claim because their actions violated a clearly established right. Each argument is addressed in turn.

### A. Plaintiff's Unlawful Entry Claim

Defendants argue they are entitled to qualified immunity on the grounds that the warrantless entry did not violate a constitutional right, as consent and exigent circumstances obviated the Fourth Amendment warrant requirement, and that it was objectively reasonable to believe those exceptions validated the constitutionality of their entry. In response, Plaintiff argues that no recognized exception to the Fourth Amendment warrant requirement was applicable in this matter. As Defendants assert entitlement to qualified immunity on this claim, the Court must first determine whether Defendants' entry into the Residence violated a constitutional right. To do so, the Court considers the applicability of the Fourth Amendment exceptions proffered by Defendants.[87]

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV; *see also U.S. v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011). "Warrantless searches and seizures inside someone's home . . . are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion." *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006) (emphasis in original) (internal citations omitted); *but see Case v. Montana*, 607 U.S. ----, No. 24-624, 2026 WL 96690, at * 5

---

[87]    In addition to arguing the inapplicability of the exceptions Defendants rely on, Plaintiff argues that the community caretaker exception cannot justify Defendants' warrantless entry. (*See* ECF 30 at p. 8). Defendants do not contest that said exception is inapposite. Accordingly, the Court does not address the applicability, if any, of the community caretaker exception to this case.

(U.S Jan. 14, 2026) (holding that the constitutionality of a warrantless entry based on the exigent circumstance of someone requiring emergency aid does not require probable cause).

### *Consent*

As noted, the Fourth Amendment prohibition against warrantless entry of a person's home "does not apply . . . to situations in which voluntary consent has been obtained[.]" *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Accordingly, "[l]aw enforcement officials may search a home without a warrant when 'voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises.'" *United States v. Livingston*, 445 F. App'x 550, 555 (3d Cir. 2011) (quoting *Rodriguez*, 497 U.S. at 181). Because Defendants argue that Killian's third-party consent justified their entry, this dispute turns on the question of Killian's authority to provide consent.[88]

"'[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared,'" *Stabile*, 633 F.3d at 230-31 (quoting *United States v. Matlock*, 415 U.S. 164, 170 (1974)). "'Common authority' is defined as 'mutual use of the property by persons generally having joint access or control for most purposes.'" *United States v. Murray*, 821 F.3d 386, 391-92 (3d Cir. 2016) (first quoting *Matlock*, 415 U.S. at 171 n.7; and then quoting *Stabile,* 633 F.3d at 230-31). Thus, an

---

[88]    Plaintiff argues that Defendants did not have, or believe they had, consent to enter Hughes' home because neither Hughes nor Ms. Hughes—*i.e.*, those with actual authority—provided consent. *See* ECF 34 at p. 10 (citing to a fragment of Officer Schmidt's deposition transcript where he testified, after being asked only whether Hughes or Ms. Hughes provided consent, that he did not believe he had their consent to enter). This argument is unavailing as consent can also be provided by a third-party, not only a current resident. The Court is persuaded that Defendants believed Killian consented to their entry because she requested their assistance and invited them into the Residence. Further, Killian was invited to the residence by Ms. Hughes to deal with the situation with Hughes. Moreover, as it appears undisputed that Killian's consent allowing Defendants to enter was voluntary, this Court considers only Killian's legal authority to provide consent.

16

entry pursuant to the consent of an individual with common authority does not violate the Fourth Amendment.

Important here, the Supreme Court has expanded the common authority doctrine to validate the constitutionality of a police officer's warrantless entry when based upon the consent of an individual with "apparent authority." *See Rodriguez*, 497 U.S. at 188-89. "A third party has apparent authority to consent to an entry by police when the circumstances presented to the officer cause the officer to reasonably believe that the third party has common authority over the premises, even though the third party does not in fact have such authority." *Kirley v. Williams*, 330 F. App'x 16, 20 (3d Cir. 2009) (citing *Rodriguez*, 497 U.S. at 179). As such, "[w]hen an individual possesses only apparent, rather than actual, common authority, the Fourth Amendment is not violated if the police officer's entry is 'based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so.'" *Murray*, 821 F.3d at 391-92. (quoting *Rodriguez*, 497 U.S. at 179, 188-89).

Here, Defendants were summoned to the Residence by Killian, who twice sought their assistance to obtain medical assistance for Hughes. They were aware that, despite not living at the Residence, Killian had the authority to remove Hughes: both as his niece and pursuant to the instruction of Ms. Hughes, who owned and lived in the Residence. Defendants also had reason to believe that Killian had a regular presence at the Residence because she told them she had been inside with Hughes before their arrival and on the day prior, and Hughes knew she had called for them to come over. Moreover, Killian let Defendants in through the front door, directed them to Hughes' bedroom, and advised Hughes the officers were entering. Notably, Hughes did not at any point communicate to Killian that she should not seek such police intervention or that she should

not allow police inside the Residence. In light of totality of these facts, Defendants reasonably believed that Killian had access and control of who would be permitted to enter the Residence.

This Court is also guided by the Third Circuit's decision in *Murray,* 821 F.3d at 391-392. There, police officers sought entry to a motel room they knew was rented by the defendant. *Id.* at 389-90. The officers knocked on the door three separate times and, each time, were greeted by the defendant's employee. *Id.* Though the employee initially turned the officers away—first when they declined her services and again when she stated she was busy—she invited them in when they identified themselves as officers. *Id.* The officers understood that the employee was working in the room. *Id.* While the officers were speaking with her, the defendant knocked and was admitted by the employee. *Id.* The Third Circuit reasoned that the facts known to the officers at the time of the entry warranted a reasonable belief that the employee had access and control over the room for most purposes, which was reinforced by the fact that defendant himself knocked on the door prior to entry. *Id.* at 391-92. The Court held that the fact that the officers knew the room was registered to the defendant did not invalidate the employee's consent to their entry because "she had common authority—or at a minimum, apparent authority—over the room." *Id.* at 392 (internal citations omitted).

This case has similarities to *Murray*. Just as in *Murray*, Defendants here understood Killian to have ongoing access to the Residence, having been present on consecutive days and apparently entrusted with admitting visitors. Just as in *Murray*, Defendants knew Killian had access to the Residence for an express purpose that involved allowing others to enter (*i.e.*, obtaining assistance for Hughes). Just as in *Murray*, Defendants were invited into the Residence by Killian through the front door, without the need for a key, and oriented to the space. And just as in *Murray*, Defendants' beliefs about Killian's authority were reinforced by Hughes' lack of verbal

18

disagreement to Killian's consent to their entry. Therefore, like in *Murray*, the facts known to Defendants at the time of entry warranted a reasonable belief that Killian had common authority— whether or not *in fact* true—over the Residence.[89] Thus, Defendants' warrantless entry pursuant to Killian's consent did not violate the Fourth Amendment.

### Exigent Circumstances

Another "well-recognized exception [to the Fourth Amendment warrant requirement] applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (alteration in original) (internal quotation marks omitted) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). The Supreme Court "has identified several exigencies that may justify a warrantless search of a home." *Id.* (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). "*Brigham City* identified one such exigency: 'the need to assist persons who are seriously injured or threatened with such injury.'" *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Brigham City*, 547 U.S. at 403).

"This 'emergency aid exception' applies if there is an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Davido v. Sec'y Pa. Dep't of Corr.*, No. 22-9000, 2025 WL 444410, at *1 (3d Cir. Feb. 10, 2025) (cleaned up); *see also Case*, 2026 WL 96690, at *1 (noting that, pursuant to said exception, "police officers may enter a home without a warrant if they have an 'objectively reasonable basis for believing' that someone inside needs emergency assistance.") (quoting *Brigham City*, 547 U.S. at 400)). When applying that

---

[89]    Because the Court finds Killian's consent was lawful pursuant to apparent authority, it need not reach the parties' arguments as to common authority.

standard, courts evaluate conduct "by looking at the 'totality of the circumstances.'"[90] *Case*, 2026 WL 96690, at *6 (internal citations omitted).

Here, the undisputed facts are that Defendants knew that Hughes was a cancer patient who suffered from mental health and alcohol abuse problems, that he had expressed suicidal thoughts, and that he possessed a knife.[91]  Defendants were also aware that Hughes' behavior led Killian to make two 911 calls requesting urgent assistance, that she felt compelled to wait outside for the officers, rather than in the house with Hughes, and that Ms. Hughes was so fearful of Hughes' conduct, she had removed herself from the Residence.  When they arrived at the Residence, Defendants learned more about Hughes' volatile state—that Hughes made clear he would not go for medical help willingly, was using profanity, possessed a knife, and had threatened anyone who approached him and offered to facilitate the provision of medical assistance.  Defendants were also aware that, out of concern for a pattern of behavior, Killian had hidden the knives in the Residence, but that Hughes was inside his room with a knife with a six-to-eight-inch blade.

The concerns of that situation were heightened by Hughes' demeanor when the officers knocked on his bedroom door, announced themselves as police officers, and informed Hughes that they wanted to help him.  During the short interaction, Hughes was intermittently verbally aggressive and at times spoke in a rambling, delirious manner.  Hughes eventually told the officers

---

[90]    In presenting their exigent circumstances argument, Defendants rely on several factors announced in a Pennsylvania Supreme Court case considering whether exigent circumstances existed to "justify a warrantless intrusion into a private dwelling to effectuate [an] arrest." *Com v. Wagner*, 486 Pa. 548, 557 (Pa. 1979).  This standard is inapposite.  Accordingly, the Court does not address those factors.

[91]    Citing her own testimony, Plaintiff contends that "Hughes had not expressed that he intended to harm himself." (Pltf's Brief, ECF 34 at p. 11).  This contention directly conflicts with the undisputed material fact that the day prior, Hughes had expressed to Killian being tired of living and that he had stopped taking his medications.  The testimony of Plaintiff, who did not speak with Hughes for thirty-six hours before the at-issue interaction, is insufficient to rebut these facts. *See Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) (holding that a plaintiff's "self-serving deposition testimony is insufficient to raise a genuine issue of material fact.").

he did not want help and went silent for over a minute. It was thus objectively reasonable for the officers to believe that Hughes would, or had, hurt himself.[92]

Based on the totality of these circumstances, Defendants had, as *Brigham City* requires, an "objectively reasonable basis for believing" that their intervention was needed to prevent serious harm.[93] Therefore, under the *emergency aid* exception, Defendants entered the Residence and used a key to open the bedroom door. Their entry was reasonable. *See City & Cty. of San Franscisco, Calif. v. Sheehan*, 575 U.S. 600, 612 (2015) (holding that officers could enter the room of a mentally ill person who had locked herself inside with a knife).

Because no constitutional right was violated by Defendants' entry into the Residence, Defendants are entitled to qualified immunity on the issue of unlawful entry. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated where the allegations established, there is no necessity for further inquiries concerning qualified immunity."). Accordingly, Plaintiff's unlawful entry claim is dismissed. [94]

### B.  *Plaintiff's Excessive Force Claim*

As to Plaintiff's excessive force claim, Defendants argue that they are entitled to qualified immunity because their reasonable use of force did not violate a constitutional right and a

---

[92]    In her opposition brief, Plaintiff baldly asserts that Officer Travis could "[a]t no time prior to opening the door . . . determine that Hughes was a harm to himself or others." (ECF 34 at p. 5) (citing Dep. of Officer Travis, ECF 34-2 at p. 36). Based on the record evidence, this Court disagrees. *See United States v. Wolfe*, 452 F. App'x 180, 184 (3d Cir. 2011) ("We should not be understood as holding that police officers cannot address ambiguous and evolving circumstances as their well-informed professional judgment dictates.").

[93]     Plaintiff's argument that "[t]here is simply no evidence that anyone was in *imminent* danger," (ECF 30 at p.7), ignores the undisputed material facts that form the basis of this Court's exigent circumstances analysis. Thus, it fails.

[94]    The parties do not distinguish between the entry into the Residence and the entry to Hughes' bedroom, though it is clear that the Officers did not enter into the bedroom. Nonetheless, the Court views the two entries as part of a single, continuous search or seizure. Regardless, the facts support that Killian's consent extended to Hughes' bedroom, and that her authority over the Residence extended her access to

reasonable officer would believe that tasing a man who is advancing towards an officer with a knife and then discharging a firearm when the taser had no effect, was lawful. Plaintiff disagrees, contending that material facts permit a reasonable inference that Hughes had not acted threateningly before Defendants entered his room and he could not reasonably have been perceived as threatening thereafter. Plaintiff also argues that Defendants' use of force violated a clearly established right. Applying the qualified immunity standard, the Court must first determine whether Defendants' use of force violated a constitutional right.

"The Fourth Amendment safeguards '[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures.'" *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (alteration and omissions in original). "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020) (internal quotation marks omitted) (quoting *Lamont*, 637 F.3d at 182-83). The parties do not dispute that Defendants' use of force constituted a seizure. Thus, only the reasonableness of the seizure is in dispute.

"A claim that a police officer used excessive force during a seizure is 'properly analyzed under the Fourth Amendment's 'objective reasonableness' standard.'" *Johnson v. City of Philadelphia*, 837 F.3d 343, 349 (3d Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Williams v. City of York, Pennsylvania*, 967 F.3d 252, 259 (3d Cir. 2020) (citation modified).

---

Hughes' bedroom. *See, e.g., U.S. v. Anderson*, 248 F. App'x 977, 979 (finding that a co-occupant of defendant's home, who was the only parental figure residing there, had common authority over the property and free access to the defendant's room).

"The 'totality of the circumstances' inquiry into a use of force has no time limit." *Barnes v. Felix*, 605 U.S. 73, 80 (2025). While "the situation at the precise time of the shooting will often be what matters most . . . earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.*; *see also Abraham v. Raso*, 183 F.3d 279, 291-92 (3d Cir. 1999) (holding that events prior to seizure must be considered in analyzing the reasonableness of the seizure).

The Supreme Court has made clear that "reasonableness [is] the ultimate—and only— inquiry." *Johnson*, 837 F.3d at 349 (citing *Scott v. Harris*, 550 U.S. 372, 382 (2007)). That is, "[w]hether or not [an officer's] actions constituted application of 'deadly force,' all that matters is whether [the officer's] actions were reasonable." *Id.* (quoting *Scott*, 550 U.S. at 383) (citations omitted) (alteration in original). To approach said inquiry, the Supreme Court has announced the following, non-exhaustive list of factors for consideration: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Abraham*, 183 F.3d at 289 (quoting *Graham*, 490 U.S. at 396).

Several principles guide this Court's analysis; *to wit*: "[a court must] analyze this question 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' making 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Johnson*, 837 F.3d at 350 (quoting *Graham*, 490 U.S. at 396-97). Courts must also be mindful that the Fourth Amendment "does not oblige an officer to passively endure a life-threatening physical assault[.]" *Id.* at 353; *see also Lamont*, 637

23

F.3d at 183 ("Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution.").

In cases where, as here, the victim of deadly force is unable to testify, the Third Circuit cautions against simply accepting "what may be a self-serving account [of the events] by the officer." *Abraham*, 183 F.3d at 294 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). However, in such cases, the summary judgment standard should not be "applied with extra rigor[.]" *Lamont*, 637 F.3d at 182. Thus, to defeat summary judgment in such cases, the non-movant must point to evidence that creates a genuine issue of material fact without "simply [relying] on the assertion that a reasonable jury could discredit the opponents' account." *Id.* (citation modified). In sum, "although reasonableness under the Fourth Amendment should frequently remain a question for the jury, defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances," *Est. of Smith v. Marasco*, 318 F.3d 497, 516 (3d Cir. 2003) (citation modified). Given that this Court addresses the merits of Plaintiff's constitutional claim for qualified immunity purposes, this standard applies to its analysis. *See Crouse*, 668 F. Supp. at 671.

Here, Plaintiff's argument that Hughes' behavior leading up to and at the moment of the seizure was non-threatening is unpersuasive. It is undisputed that Hughes verbally threatened the officers with a knife, *see supra* p. 5, when he learned they were responding to the Residence, that Killian sought urgent police response because Hughes was "being very threatening," and that both a certified recovery specialist and Ms. Hughes felt unsafe around Hughes. Defendants were also aware of Hughes' conduct the day prior, which Plaintiff herself recognizes as threatening. (*See* Dep. of Plaintiff, ECF 31-1 at p. 42:18-42:2) ("I would consider [Hughes holding a knife towards

24

Killian] to be threatening behavior"). While Plaintiff is entitled to all reasonable inferences being drawn in her favor, the Court declines Plaintiff's invitation to draw an unreasonable inference from these facts to find—as Plaintiff urges—that Hughes had not done anything threatening prior to Defendants' standoff at the entrance of Hughes' bedroom. *See Mumtaz v. Etihad Airways and Airlines*, No. 12-cv-2051, 2014 WL 7405216, at *5 (E.D. Pa. Dec. 30, 2024) ("[T]he summary judgment standard does not denote what a fact-finder may find upon delusion, but rather what a *reasonable* fact-finder could conclude from the evidence presented." (emphasis in original)). Based on the totality of these facts, the Court finds that, Defendants had a reasonable belief that Hughes was a threat to himself, *see supra* pp. 18-21, and a reasonable belief that Hughes posed a threat to others leading up to the seizure.

Turning to the moment of the shooting, the following material facts are uncontested: Defendants opened Hughes' bedroom door using a key, and Hughes turned towards them, holding a six-to-eight-inch blade knife; Defendants were in close proximity to Hughes, approximately six feet or less; Officer Schmidt repeatedly instructed Hughes to drop the knife he held in his right hand, and Hughes failed to comply; Defendants remained in the hallway while Hughes advanced towards them, stating a profanity and ignoring Officer Schmidt's repeated commands to drop the knife; Officer Travis administered his taser when Hughes was approximately four feet away from them; Hughes' shoulder momentarily dropped from the taser's electricity, yet he continued to advance towards Defendants, knife in hand[95]; Officer Schmidt continued to instruct Hughes to drop his knife; and when Hughes failed to comply and continued to advance toward them, Officer

---

[95]    While Plaintiff argues that Officer Schmidt "shot Hughes while [Officer Travis] was still tasing him and [Hughes] did not have control of his body," (ECF 34 at p. 13), she does not squarely contest Defendants' assertion that Hughes continued to advance toward the officers, knife in hand, after being tased. Although it can be reasonably inferred that Hughes' movement was in some way impaired by Officer Travis' taser, the fact that Hughes continued to advance towards Defendants after being tased is undisputed.

Schmidt discharged his firearm, shooting Hughes in the chest, while the electricity from Officer Travis' taser continued to pulsate.

In light of these undisputed facts, Plaintiff urges this Court to infer that Hughes was not wielding the knife in a manner that could reasonably be interpreted as threatening when considering also the undisputed facts that he weighed 110 pounds and was a stage four cancer patient. Plaintiff's proposed inferences cannot stand in view of the myriads of other facts that support the contrary conclusion. Therefore, the Court declines Plaintiff's invitation to speculate that the manner in which Hughes was wielding a knife could not be interpreted as threatening based on the totality of the circumstances and on no more than Plaintiff's hindsight assessment. What is important to remember is whether the Officers' actions were reasonable under the totality of the circumstances as they experienced them, and this Court finds they were.

Having identified all relevant material facts and drawing all inferences in the non-movant Plaintiff's favor, "the reasonableness of an officer's actions 'is a pure question of law.'" *Johnson*, 837 F.3d at 349 (quoting *Scott*, 550 U.S. at 381 n. 8). Upon review of the evidence, this Court finds that Defendants' actions were reasonable as a matter of law. Hughes wielded a knife, refused to comply with officer commands to drop the knife, advanced toward the officers while exclaiming "f—ck you," did not drop the knife after being tased, and the shooting took place while Hughes was only a few feet from Officer Schmidt. Although Plaintiff insists that the taser prevented Hughes from controlling his body, Hughes indisputably continued to hold the knife and advance toward the officers, in cramped quarters, after being repeatedly instructed to drop the knife and after being tased. Thus, even if the taser in some way affected Hughes' ability to control his movements, the officers reasonably believed they were still in danger. Therefore, at the moment of the shooting, the "defensive use of deadly force, although unfortunate, did not violate the Fourth

26

Amendment." *Sheehan v. City & Cnty. of San Fran.*, 743 F.3d 1211, 1230 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. City & Cnty. of San Fran., Calif. v. Sheehan*, 575 U.S. 600 (2015).

The Supreme Court has held that officers did not violate the Fourth Amendment when they used deadly force during an encounter similar to the one at issue here. In *Sheehan*, officers were dispatched to a group home to help a mentally ill woman. 575 U.S. at 602. Upon arrival, a social worker informed the officers that the woman had threatened him with a knife and that she needed to be detained for a psychiatric evaluation. *Id.* at 603. The officers knocked on the door of the woman's room and offered their assistance. *Id.* at 604. When the woman did not answer, they entered. *Id.* at 604-05. The woman reacted violently, grabbing a knife, and threatening to kill the officers. *Id.* The officers retreated and called for backup. *Id.*

Concerned that the woman might continue to arm herself or flee, the officers chose to reenter, weapons drawn, before backup arrived. *Id.* at 604-05. Upon reentry, the woman again advanced toward them with the knife and, even after being pepper-sprayed, continued moving toward them. *Id.* at 605-06. When she was within a few feet and refused to drop the knife, one officer opened fire, ultimately shooting her multiple times. *Id.* The woman survived. *Id.* at 606. The Supreme Court held that, at the point when the woman was in close proximity to an officer and kept advancing despite the pepper spray, "the use of potentially deadly force was justified" and "[n]othing in the Fourth Amendment barred [the officers] from protecting themselves[.]" *Id.* at 613 (first citing *Scott*, 550 U.S. at 384; then citing *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)). So too here.

The Court finds that Defendants' use of force did not violate a constitutional right and, therefore, Defendants are entitled to qualified immunity on Plaintiff's excessive force claim. As

27

such, this Court need not reach the clearly established inquiry of its qualified immunity analysis.[96]

*See Saucier*, 533 U.S. at 201.  As such, Plaintiff's excessive force claim is dismissed.

### II.        State Law Battery Claim

Based on similar averments as her excessive force claim, Plaintiff asserts a state law battery

claim against Defendants.  By way of the underlying motion, Defendants argue that they are also

entitled to immunity from Plaintiff's battery claim pursuant to the Pennsylvania Political

Subdivision Tort Claims Act, 42 Pa. Cons. Stat. §§ 8541–8564, ("PPSTCA"), on the grounds that

employees of local agencies are immune from state law tort claims and no exception to that

immunity exists here.[97]   In response, Plaintiff argues that Defendants are barred from that

immunity because a reasonable jury could find that their conduct constituted actual malice and/or

willful misconduct.[98]

"Generally, local agencies are immune from tort liability under Section 8541 of the Tort

Claims Act."  *Gillingham v. Cnty. of Delaware*, 154 A.3d 875, 877-78 (Pa. Commw. Ct. 2017)

---

[96]      While not dispositive, the Court notes that, in light of the Supreme Court's holding in *Sheehan* upholding the reasonableness of an officer's use of force in analogous circumstances, Plaintiff's argument that Defendants' use of force violated a clearly established right is unpersuasive.  Moreover, the caselaw Plaintiff relies on for her argument are distinguishable from this case.  *Cf. Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (announcing principle that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead"); *Bennett v. Murphy*, 120 F. App'x 914 (3d Cir. 2005) (holding that any reasonable officer would understand that clearly established law prohibited the use of fatal force by an officer standing far away from an individual who had been surrounded by armed officers for about an hour, had a gun pointed to his own head and was threatening suicide).

[97]      The parties do not dispute that Muhlenberg Township is a "local agency" for purposes of the PPSTCA, and that Defendants are Muhlenberg Township employees.  *See* 42 Pa. Cons. Stat. § 8501 (defining "local agency" as a "government unit other than the Commonwealth government").

[98]      Under Pennsylvania law, the term "actual malice" appears to be exclusively associated—in the civil context—with the tort of defamation.  *See, e.g.*, *DiPaolo v. Times Publ'g Co.*, 142 A.3d 837, 843 (Pa. Super. Ct. 2016) (noting that a defamation claim requires, *inter alia*, a showing of actual malice, and defining that term).  Given the lack of guidance from Plaintiff as to the definition of actual malice in the context of a battery, and as the applicable case law considers only willful misconduct, the Court does not reach the issue of whether Defendants acted with actual malice for purposes of determining their entitlement to PPSTCA immunity.

(internal citation and quotation marks omitted).  Specifically, Section 8541 of the PPTSCA provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof . . . ."  42 Pa. Cons. Stat. § 8541.  However, pursuant to Section 8550 of the PPTSCA, "[a]n employee's immunity does not extend to acts that are judicially determined to be crimes, actual fraud, actual malice, or willful misconduct."  *Renk v. City of Pittsburgh*, 641 A.2d 289, 292 (Pa. 1994) (citing 42 Pa. Cons. Stat. § 8550).

"[T]he Pennsylvania Supreme Court has recognized [that] willful misconduct is a demanding level of fault."  *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006).  For purposes of Section 8550 employee immunity, "willful misconduct occurs when the actor desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue."  *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1023 (Pa. Commw. Ct. 2014) (citation and internal quotation marks omitted).  To establish willful misconduct in the context of an intentional tort claim against a police officer, "it must be shown that the officer *intended* to commit the intentional tort."  *Pettit v. Namie*, 931 A.2d 790, 801 (Pa. Commw. 2007) (internal citation omitted) (emphasis added); *see also Renk*, 537 Pa. at 283-94 (holding that a finding of tort liability is insufficient to establish willful misconduct as it "is conceivable that a jury could find a police officer liable for [assault and battery] under circumstances which demonstrate that the officer did not intentionally use unnecessary and excessive force.").  Nonetheless, courts recognize that "the willful misconduct exception is foreclosed if [officers] are entitled to qualified immunity."  *Salaam v. Wolfe*, 2019 WL 3889745 (E.D. Pa. Aug. 19, 2019), *aff'd* 806 F. App'x 90 (3d Cir. 2020).

29

Here, because Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claims, Plaintiff's state law battery claim is barred by the PPSTCA. *See Salaam*, 806 F. App'x at 94-95 ("[B]ecause the defendants are entitled to qualified immunity on the federal claims, [Plaintiff's] state law claims are foreclosed.") (citing *Vargas v. City of Phila.*, 783 F.3d 962, 975 (3d Cir. 2015) (quoting 42 Pa. Cons. Stat. § 8850)).

In any event, Plaintiff's argument that Defendants are not entitled to PPSTCA immunity is unavailing. Nothing in the record suggests that Defendants intentionally used unnecessary and excessive force, *see supra* pp. 21-27 (Defendants use of force was reasonable), nor that they employed force against Hughes with the intent to commit a battery. *Au contraire*, the record fails to show that Defendants acted with any other purpose than to help Hughes. Therefore, Defendants' conduct did not rise to the level of willful misconduct such that Defendants would be precluded from PPSTCA immunity. Since there is no evidence from which a jury could find that Defendants intended to commit a battery or to bring about the harm Hughes' suffered, even absent the Court's grant of qualified immunity, under the PPSTCA Defendants are immune from liability for battery.

For the foregoing reasons, Plaintiff's state-law battery claim is dismissed.

**CONCLUSION**

For the reasons set forth, Plaintiff's cross-motion for partial summary judgment is denied, and Defendants' motion for summary judgment is granted on the grounds that Defendants have qualify immunity from Plaintiff's claims. Accordingly, the complaint is dismissed. A corresponding Order will accompany this opinion.

*NITZA I. QUIÑONES ALEJANDRO*, J.

30